## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
## WHITE PLAINS DIVISION

| | |
|---|---|
| **CAROL WHYBLE individually and on behalf of all others similarly situated,** | Civil No. |
| **Plaintiff,** | |
| **v.** | |
| **THE NATURE'S BOUNTY CO.,** | |
| **Defendant.** | |

## CLASS ACTION COMPLAINT

Plaintiff Carol Whyble ("Plaintiff") brings this class action complaint against Defendant The Nature's Bounty Co. ("Defendant"), individually and on behalf of all others similarly situated, and allege upon personal knowledge as to her acts and experiences, and, as to all other matters, upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This is a consumer protection class action arising out of Defendant's false and misleading advertising of its glucosamine joint health products.

2.      Defendant distributes, markets, and sells a glucosamine-based dietary supplement which it advertises for the treatment of osteoarthritis and the symptoms associated with osteoarthritis. Defendant calls its product "Osteo Bi-Flex." Defendant advertises that Osteo Bi-Flex provides "JOINT HEALTH," and assists with joint pain, flexibility and mobility including because it provides "improved joint comfort," increases "range of motion," "strengthen[s] joints," "support[s] flexibility," and "support[s] mobility." *See* Osteo Bi-Flex products' packaging attached hereto as Exhibit "A". Its advertising claims, however, are false, misleading, and reasonably likely to deceive a reasonable consumer.

3.      Plaintiff brings this action individually and on behalf of all other similarly situated consumers who purchased Osteo Bi-Flex in New York between January 19, 2016, and the date notice is disseminated. Based on violations of New York General Business Law sections 349 and 350, Plaintiff seeks to halt Defendant's dissemination of this false and misleading advertising message, to correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have purchased Defendant's Osteo Bi-Flex products at issue.

00163724

## JURISDICTION AND VENUE

4.     The Court has original jurisdiction under to 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members, and some of the members of the class are citizens of states different from Defendant.

5.     This Court has personal jurisdiction over Defendant because Defendant conducts business in this district. Defendant has marketed, promoted, distributed, and sold the Osteo Bi-Flex products at issue in New York, rendering exercise of jurisdiction by New York courts permissible.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because Plaintiff Whyble purchased Osteo Bi-Flex in this district. Venue also is proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this district.

## PARTIES

7.     Plaintiff Carol Whyble is a citizen of New York, and, at all times relevant to this action, resided in Dutchess County, New York. Plaintiff Whyble saw Defendant's representations by reading the label of an Osteo Bi-Flex Triple Strength product package at a Rite Aid pharmacy in Hyde Park, New York during the class period. In reliance on the claims at issue made on the label, Plaintiff Whyble purchased the Osteo Bi-Flex Triple Strength product on several occasions at the Rite Aid pharmacy located at 1 Crum Elbow Rd, Hyde Park, NY 12538 in 2016 and 2017. By purchasing the deceptively advertised product, Plaintiff Whyble suffered injury-in-fact and lost money because Osteo Bi-Flex does not provide the promised benefits. Had Plaintiff Whyble known the truth about Defendant's advertisements at the time of her purchases, she would not have purchased Osteo Bi-Flex. Plaintiff continues to desire to

2

purchase a joint health product and believes she would purchase a joint health supplement if it worked as advertised. However, as a result of Defendant's ongoing false advertising, Plaintiff will be unable to rely on the advertising when deciding in the future whether to purchase Osteo Bi-Flex.

8.      The Nature's Bounty Co. is a Delaware corporation with its principal place of business located at 2100 Smithtown Ave., Ronkonkoma, New York. Defendant manufactures, advertises, markets, distributes, and sells the Osteo Bi-Flex products to hundreds of thousands of consumers throughout the United States. Defendant's principle business is manufacturing, marketing and selling dietary supplements and vitamins. It is a global leader in the dietary supplement market with sales of over $3 billion last year.

## FACTUAL ALLEGATIONS

### I.    *Defendant's Glucosamine Products*

9.      Defendant sells Osteo Bi-Flex through its website, www.osteobiflex.com, and through various retail stores, including Walgreens, Walmart, and Costco.

10.     Defendant's Osteo Bi-Flex products at issue are:

- Osteo Bi-Flex One Per Day;

- Osteo Bi-Flex Triple Strength;

- Osteo Bi-Flex Triple Strength MSM; and

- Osteo Bi-Flex Triple Strength with Vitamin D.

11.     The main ingredient in the Osteo Bi-Flex products is 1,500 mg of glucosamine hydrochloride per serving.

12.    Glucosamine hydrochloride is a combination of glucosamine (an amino sugar that is produced by the body in abundance) and hydrochloric acid. The glucosamine in Osteo Bi-Flex comes from crushed up shellfish.

13.    Defendant markets Osteo Bi-Flex to treat, prevent or cure osteoarthritis and its cardinal symptoms. Sometimes called degenerative joint disease or degenerative arthritis, osteoarthritis is the most common chronic condition of the joints, affecting over 32 million Americans. Osteoarthritis can affect any joint, but it occurs most often in knees, hips, hands, and the spine. According to the Arthritis Foundation, one in two adults will develop symptoms of osteoarthritis. According to the Mayo Clinic, the cardinal signs and symptoms of osteoarthritis include joint pain, joint tenderness, joint stiffness, and loss of flexibility or the inability to move your joint through its full range of motion.[1]

14.    Many people suffer from the symptoms that characterize osteoarthritis – joint pain, stiffness, and lack of mobility – but do not know they have osteoarthritis. This is because osteoarthritis typically develops slowly, so its symptoms are not severe enough to cause the person to seek medical intervention, but significant enough to cause the person to seek remedies for the symptoms. As a result, many Osteo Bi-Flex purchasers have not yet been diagnosed with osteoarthritis. Knowing this, Defendant advertises through implied messaging that Osteo Bi-Flex treats the cardinal symptoms of osteoarthritis. Even its name, Osteo Bi-Flex, suggests it is for osteoarthritis and its symptoms.

## II.    *Defendant's False and Deceptive Advertising*

15.    Defendant's target audience are middle-age and older consumers with pre- and early to mid-stage osteoarthritis. Based on well-conducted consumer research, Defendant has

---

[1]    https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925 (last visited April 10, 2020).

00163724

finely honed its package labeling to target this population, becoming the largest seller of joint health dietary supplements.

16.    Leading with the package label for Osteo Bi-Flex and reinforced through other advertisements, Defendant conveys to consumers that its Osteo Bi-Flex will improve joint health, reduce recurring joint pain, stiffness, and increase mobility, strength and flexibility for anyone who takes Osteo Bi-Flex.

17.    The front panel of the packaging for all Osteo Bi-Flex products is materially the same and communicates the same implied advertising message. On the front label, immediately below "Osteo Bi-Flex" is printed prominently and in all caps, "JOINT HEALTH", "GLUCOSAMINE," "**JOINT SHIELD**", and "Shows Improved Joint Comfort within **7 Days!**" *See* Exhibit A (the Osteo Bi-Flex products' packaging). Among other things, this statement conveys the implied message that consumption of Osteo Bi-Flex can reduce or relieve joint pain. Defendant uses the word "comfort" to mean pain relief. This is consistent with its market research and the common understanding of "comfort." (The Cambridge Dictionary defines "comfort" as "the pleasant and satisfying feeling of being physically or mentally free from pain …"[2] The Macmillan Dictionary defines "comfort" as "a physically relaxed state, without pain or other unpleasant feelings."[3] The Oxford Learner's Dictionary defines "comfort" as "the state of being physically relaxed and free from pain …"[4] The Collins dictionary defines "comfort" as "physically relaxed and contented, and are not feeling any pain or other unpleasant sensations."[5]

---

[2]        https://dictionary.cambridge.org/us/dictionary/english/comfort

[3]        https://www.macmillandictionary.com/us/dictionary/american/comfort_1

[4]        https://www.oxfordlearnersdictionaries.com/us/definition/english/comfort_1?q=comfort

[5]        https://www.collinsdictionary.com/us/dictionary/english/comfort

00163724

The Longman dictionary defines "comfort" as "a feeling of being physically relaxed and satisfied, so that nothing is hurting you …"[6])

18.    The front label for each Osteo Bi-Flex product appears as follows:



| Osteo Bi-Flex One Per Day | Osteo Bi-Flex Triple Strength | Osteo Bi-Flex Triple Strength MSM | Osteo Bi-Flex Triple Strength with Vitamin D |
|---|---|---|---|

19.    To reinforce the joint health message, Defendant repeats similar claims about osteoarthritis symptoms throughout the package label, including  that Osteo Bi-Flex will help with "Range Of Motion," will "Strengthen Joints," "Support Flexibility," "Support Mobility," "supports joint comfort," "defend your joints," and "helps strengthen joints while helping to maintain joint cartilage essential for comfortable joint movement". *See* Exhibit A (the Osteo Bi-Flex products' packaging).

20.    To add credibility to the advertising, Defendant provides consumers with an additional "reason to believe" the joint health message. Providing a reason to believe advertising is a key psychological component to successful advertising. A reason to believe offered by

---

[6]      https://www.ldoceonline.com/dictionary/comfort

Defendant and printed on every label is that Osteo Bi-Flex is the "**#1** Pharmacist Recommended Brand." This message misleadingly promotes a placebo effect on consumers.

21.     Knees are the most common joint to develop osteoarthritis. Knowing this, Defendant puts on every label of Osteo Bi-Flex a graphic of a bent knee next to the promise to "strengthen joints," "support flexibility," and "support mobility." The label panel is as follows:



22.     The Osteo Bi-Flex packaging also references two studies that examined whether one of the ingredients provides pain relief in people with osteoarthritis. The two studies are titled "Comparative Efficacy and Tolerability of 5-Loxin® and Aflapin® Against Osteoarthritis of the Knee: A Double Blind, Randomized, Placebo Controlled Clinical Study" and "A Double Blind, Randomized, Placebo Controlled Clinical Study Evaluates the Early Efficacy of Aflapin® in Subjects with Osteoarthritis of Knee." On Defendant's website for Osteo Bi-Flex, it lists references to selected scientific articles about how Osteo Bi-Flex purportedly works in treating pain and other osteoarthritis symptoms in people with osteoarthritis.

23.     Although the package label is the single most important component of Defendant's marketing strategy, it also closely controls how retailers advertise Osteo Bi-Flex. These retailers also often aggressively advertise that Osteo Bi-Flex relieves pain and other symptoms of osteoarthritis. For example, on BJ's Wholesale website, Osteo Bi-Flex is advertised

00163724

to "Ease arthritis pain with this dietary supplement that helps promote joint health and comfort within just 7 days of use."[7]

24.    On Walmart.com, Osteo Bi-Flex promises to "help[] with occasional joint stiffness and soothe[] joints."[8]

25.    Defendant also reinforces the claims made on its labels through spokespersons, such as a pharmacist named Jason Poquette and professional golfer Rocco Mediate, with express and implied messaging that Osteo Bi-Flex can reduce joint pain and prevent the symptoms associated with arthritis.

26.    In an article titled "Follow these golden rules: Six tips for playing better, healthier senior golf" on golfadvisor.com, the article states Osteo Bi-Flex relieves joint pain:

**Consider nutritional supplements**

…[PGA golfer Rocco] Mediate recently agreed to represent a company called Osteo Bi-Flex, which makes several formulas that do just that. He credits Osteo Bi-Flex with helping him play pain free. I also tried the product (been taking the Joint Formula Gummies, along with some other supplements) and did notice less pain and more flexibility in joints as well. So how, exactly, does this stuff work? According to Jason Poquette, a registered pharmacist and spokesman for Osteo Bi-Flex, the products contain ingredients like glucosamine and chondroitin, which aid joint health. The Osteo Bi-Flex line also includes a proprietary Joint Shield formulation that includes AKBA (acetyl-keto-beta-boswellic acid), which helps with occasional joint flare-ups.[9]

27.    On progolfnow.com, another article specifically describes Rocco Mediate's use of Osteo Bi-Flex. Mediate is quoted as saying "I've suffered from body aches throughout my entire

---

[7]    https://www.bjs.com/product/osteo-bi-flex-1500mg-glucosamine-hcl-tablets-200-ct/185057

[8]    https://www.walmart.com/ip/Osteo-Bi-Flex-Caplets-Advanced-Triple-Strength-120-Coated-Tablets/10312328?athcpid=10312328&athpgid=athenaItemPage&athcgid=null&athznid=PWVAV&athieid=v0&athstid=CS020&athguid=793f015e-b41-170f01bb9848d5&athancid=null&athena=true

[9]    https://www.golfadvisor.com/articles/follow-these-golden-rules-six-tips-for-playing-better-healthier-senior-golf

golf career, and as the years go by, I feel it more and more. … I'm thrilled to partner with the Osteo Bi-Flex brand …."[10]

28.    A YouTube video posted on the Post Game channel titled "Rocco Mediate Talks About Pilates And Supplements Helping with Joint Pain," Mediate is wearing an Osteo Bi-Flex hat and discussing Osteo Bi-Flex. He states "as you get older or even when your young sometimes it's hard to joints not as smooth as you want them to be or stiffer than you want them to be right this helps that it made a big difference … especially as you get older … it definitely makes a difference … I had a back injury years and years ago 20 some years ago so I've always had problems with things not moving as well as they should and this makes it move better …"[11]

29.    On Defendant's website, naturesbountyco.com, an article titled "Osteo Bi-Flex Congratulates Spokesperson Tim Raines on National Baseball Hall of Fame Selection" also reinforces Osteo Bi-Flex's joint pain and stiffness message:

> As professional athletes near retirement after playing for many years, the game may start to take a toll on the body. As they get older, they can easily succumb to body aches and increased concerns about joint comfort that didn't used to exist earlier in their careers. Osteo Bi-Flex is focused on providing support to millions of Americans so they can enjoy all that life has to offer.[12]

30.    The extensive market research performed on the multi-billion-dollar joint supplement category shows that most joint health supplement consumers are older, experience joint pain, suffer from arthritis, consider glucosamine and chondroitin important and specifically associate those ingredients with providing joint pain relief, perceive joint health supplements as fairly undifferentiated, and purchase joint supplements including Osteo Bi-Flex primarily to provide relief from joint pain, joint stiffness, and other cardinal symptoms of arthritis.

---

[10]    https://progolfnow.com/2017/02/17/rocco-mediate-signs-sponsorship-deal-osteo-bi-flex/

[11]    https://www.youtube.com/watch?v=DgbguFh2ARs&feature=youtu.be

[12]    https://www.naturesbountyco.com/news/2017/01/osteo-bi-flex-congratulates-spokesperson-tim-raines-on-national-b/

00163724

31.    In 2017, over 1,800 adults were surveyed for the "2017 Gallup Study of Supplements for Joint Health." Gallup reported that one of the strongest likelihoods of continuing/starting joint health supplements is "severe joint pain." 60% of those surveyed indicated they were aware of glucosamine products for prevention and therapeutic use. The study reported that use of joint health supplements peaks among joint pain sufferers who are diagnosed with osteoarthritis.

32.    In 2015, global marketing firm Ipsos conducted in-depth market research of Osteo Bi-Flex and its competitors. It found that the market segment to be significantly skewed towards older consumers seeking to address pain, stiffness, and osteoarthritis. Ipsos found that Osteo Bi-Flex advertising is aimed at older consumers and that joint pain makes consumers feel frustrated, annoyed and depressed, but they are hopeful the supplement will address these ailments, with the top hoped-for benefit of "better joint comfort", which "means no pain."

33.    In a 2011 report, consumer research group Karlen Williams Graybill Advertising found that Osteo Bi-Flex had the highest brand awareness in the joint care supplement category and "[o]steoarthritis sufferers, diagnosed or not, are the target" audience. These conclusions were based on analysis of multiple quantitative and qualitative market research reports. These included 2009 research from MarketTools where 85% of respondents agreed "loss of flexibility" is how arthritis and joint pain affected their lives.

34.    In June and July 2017, Multi-Sponsor Surveys Inc. reported results from "The 2017 Gallup Study of Supplement for Joint Health." The 2017 Gallup Study was conducted in two phases with the first (involving 1,035 respondents) measuring the size of the joint health market, and the second (involving 820 respondents) examining adults' choice of preventative and treatment methods. Gallup found that almost half of US adults suffer from joint problems,

00163724

which are often associated with both arthritis and joint pain, stiffness or loss of flexibility, knees are the body part most associated with pain and stiffness, incidence of joint problems rises steadily with age, glucosamine and chondroitin are the nutrients most widely used for joint health, and that Osteo Bi-Flex was the most well-known supplement to treat or prevent joint problems, with the top reason for using joint health supplements was to relieve joint pain or discomfort. Gallup also reported on results from interviews of 39 Osteo Bi-Flex users and found that 68% of them had diagnosed arthritis. 77% of the Osteo Bi-Flex users also reported moderate or severe joint problems.

35.    Over 50 million Americans had arthritis in 2009, and this number is expected to grow to 67 million by 2030, with many more who are undiagnosed.

36.    On its packaging, Defendant includes a fine-print statement required by the FDA that the products are not intended to diagnose, treat, cure or prevent any disease. The statement, however, does not disavow the express and implied statements Defendant makes on the packaging and elsewhere and, if it could be interpreted to do so, would contradict these statements in violation of consumer protection law. At any rate, it is well established that consumers regularly do not read and do not consider the fine-print statement when buying dietary supplements. For example, France and Bone (2005) looked at the impact this mandatory statement and the structure/function characterization has on consumer beliefs when interpreting such claims.[13] They found that consumer disease beliefs are not "lower when the [mandatory statement] is used on the package than when it is not." Similarly, Mason et al. (2007) conducted two surveys about the impact of the mandatory statement on consumer perceptions of safety or

---

[13]    France and Bone, *Policy Makers' Paradigms and Evidence from Consumer Interpretations of Dietary Supplement Labels*, Journal of Consumer Affairs, 39(1):27-51 (2005).

00163724

efficacy of dietary supplements.[14] Professor Mason et al. concluded "No difference was found in efficacy perceptions for subjects exposed to the disclaimer compared to the control." They also noted that "It is particularly noteworthy that the mandated disclaimer did not impact either efficacy perceptions (as intended) or safety perceptions (as might be expected, given the nature of the disclaimer) any differently than the control message."[15]

**IV.**     ***Scientific Evidence Confirms that Osteo Bi-Flex Does Not Work As Advertised***

37.     Despite Defendant's representations, the ingredients in Osteo Bi-Flex have been extensively studied in large, well-conducted and published studies involving persons with and without diagnosed arthritis and have been shown ineffective at supporting or benefiting joint health, including the signs and symptoms of osteoarthritis.

38.     Osteo Bi-Flex does not play any special or unique role in the synthesis or repair of cartilage molecules beyond any other food product. A healthy joint does not need exogenous glucosamine or chondroitin because it maintains its structure and function from the body's abundant source of glucose and proteoglycan synthesis. The process is only disrupted as a result of disease.

39.     Likewise, as cartilage in a healthy joint degrades, the joint creates new cartilage at the same rate, so the structure and function a healthy, non-diseased joint remains the same. As

---

[14]     Mason et al., *The Impact of Warnings, Disclaimers, and Product Experience on Consumers' Perceptions of Dietary Supplements*, Journal of Consumer Affairs, 41(1):74-99 (2007).

[15]     *See also* Kesselheim et al., *Mandatory Disclaimers On Dietary Supplements Do Not Reliably Communicate The Intended Issue*, Health Affairs, 34(3):438-446 (2015) at 445 ("We found ample evidence that such disclaimers are often misunderstood or ignored by consumers and had no effects on consumers' ability to understand messages about health care products and critically evaluate potentially unsupported statements about effectiveness or safety."); Tonya Dodge, *Consumers' perceptions of the dietary supplement health and education act: implications and recommendations*, Drug Testing and Analysis, 8:407-409 (2016) at 409 ("research suggests that the labelling requirements of DSHEA have little reliable impact on consumer beliefs about the risk and effectiveness of dietary supplements").

00163724

a result, if a substance such as Osteo Bi-Flex altered this homeostatic state by either stiffening or softening normal cartilage, disease would result. Osteo Bi-Flex does not "help[] maintain joint cartilage."

40.    Studies involving people with diagnosed osteoarthritis apply to people who have the symptoms of osteoarthritis, but are not diagnosed with it. People who suffer from the cardinal symptoms of osteoarthritis – recurring joint pain, joint stiffness, and loss of flexibility or mobility that prevents movement of a joint through its full range of motion – have pre-osteoarthritis and early stage osteoarthritis. In support of its advertising claims, Defendant cites to two studies involving people with osteoarthritis on Osteo Bi-Flex's packaging, Sengupta et al. (2008) and Sengupta et al. (2010).

### Randomized Clinical Trials

41.    Well designed and implemented randomized clinical trials ("RCTs") are "the gold standard for determining the relationship of an agent to a health outcome." Federal Judicial Center, *Reference Manual on Scientific Evidence*, 555 (3d ed. 2011). "Double-blinded" RCTs, where neither the trial participants nor the researchers know which participants received the active ingredient, is considered the optimal strategy.

42.    The main ingredients in Osteo Bi-Flex have been extensively studied and the well-designed and conducted RCTs demonstrate that the ingredients, alone or in combination, are not effective at producing joint health benefits, including reducing joint pain, discomfort, or stiffness, or increasing mobility, range of motion, or flexibility. Yet, Defendant markets Osteo Bi-Flex to people with and without diagnosed arthritis.

43.    As explained below, numerous scientific studies on persons with and without diagnosed arthritis have demonstrated that Osteo Bi-Flex is incapable of providing the joint

13

health benefits represented by Defendant. For example, the leading series of studies testing glucosamine and chondroitin are known as the "GAIT" studies, proved that glucosamine, with or without chondroitin, does not provide relief from joint pain, reduce joint stiffness, promote flexibility, mobility or range of motion, or help maintain healthy joint cartilage. The GAIT studies were independently conducted and funded by the National Institutes of Health (the "NIH"). The primary GAIT study cost over $12.5 million. Likewise, the studies conducted by Kwoh et al. (2014), Runhaar et al. (2015), Landsmeer et al. (2016), and de Vos et al. (2017) examined persons without diagnosed arthritis and concluded that glucosamine does not improve overall quality of life or otherwise impact knee pain, joint stiffness, mobility and range of motion, physical function, or the incidence of osteoarthritis.

44.    In 2006, results from the primary GAIT study – a 1,583-patient, 24-month, multi-center RCT – were published in the New England Journal of Medicine (the "2006 GAIT Study"). The 2006 GAIT Study concluded: "[t]he analysis of the primary outcome measure did not show that either [glucosamine or chondroitin], alone or in combination, was efficacious …." Clegg et al., *Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis*, New England J of Med, 354(8):795-808 (Feb 2006). The authors further explained: "Glucosamine and chondroitin sulfate alone or in combination did not reduce pain effectively in the overall group of patients" and "[a]nalysis of the primary outcome in the sub-group of patients with mild pain showed even smaller treatment effects."

45.    The 2006 GAIT Study also concluded that glucosamine hydrochloride (*i.e.*, the version of glucosamine present in the Osteo Bi-Flex products), chondroitin, and their combination do not relieve joint stiffness, improve joint function, impact joint swelling, or improve health-related quality of life as measured by eight domains: vitality, physical

00163724

functioning, bodily pain, general health perceptions, physical role functioning, emotional role functioning, social role functioning, and mental health.

46.    In 2008, findings from another NIH-funded GAIT study were published. *See* Sawitzke et al., *The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis: A GAIT Report*, J Arthritis Rheum, 58(10):3183–91 (Oct 2008). The 2008 GAIT study explored the effects of glucosamine, chondroitin, and their combination on progressive loss of joint space width. Loss of joint space width is a structural condition associated with increased joint pain and decreased joint mobility and flexibility, and is a precursor of arthritis. The researchers examined 572 persons and found "no significant differences in mean [joint space width] loss over 2 years between the treatment groups and the placebo group …." In other words, glucosamine and chondroitin, alone or in combination do not work and do not impact joint space width loss or otherwise help maintain or rebuild cartilage.

47.    In 2010, a third set of results from the GAIT studies were reported. *See* Sawitzke et al., *Clinical Efficacy And Safety Of Glucosamine, Chondroitin Sulphate, Their Combination, Celecoxib Or Placebo Taken To Treat Osteoarthritis Of The Knee: 2-Year Results From GAIT*, Ann Rhem Dis, 69(8):1459-64 (Aug 2010). Authors of the 2010 GAIT report examined 662 persons over a two-year period and concluded that glucosamine and chondroitin, alone or in combination, do not provide pain, function, stiffness or mobility benefits. The authors also determined glucosamine and chondroitin do not benefit those with moderate-to-severe knee pain – a *post-hac*, secondary analysis which the original GAIT publication found inconclusive.

48.    In addition to the three GAIT studies, four other RCTs have examined a combination of glucosamine and chondroitin sulfate versus placebo. Each of these studies found glucosamine and chondroitin do not work.

15

49.    In 2007, Messier et al. published results from their 12-month, double-blind RCT examining 89 subjects in the United States. Messier et al., *Glucosamine/chondroitin combined with exercise for the treatment of knee osteoarthritis: a preliminary study*, Osteoarthritis and Cartilage, 15:1256-1266 (2007). The study was supported by a grant from Defendant's subsidiary, Rexall Sundown, Inc. Messier and co-authors concluded that daily consumption of a combination of glucosamine hydrochloride and chondroitin sulfate does not improve knee extension strength or provide joint pain, function, stiffness, mobility or balance benefits.

50.    Fransen et al. (2015) was a double-blind, randomized, placebo-controlled clinical trial examining 605 participants over a 2-year period. Fransen et al., *Glucosamine and chondroitin for knee osteoarthritis: a double-blind randomized placebo-controlled clinical trial evaluating single and combination regimens*, Ann Rheum Disease, 74(5):851-858 (May 2015). Fransen concluded that glucosamine and chondroitin, alone or in combination, are no better than placebo for reducing pain or improving physical function:

> For the main symptomatic outcome … no significant effect on maximum knee pain over year 1 … was demonstrated for the three treatment allocations, compared with placebo. Over year 2 … there were no differences between the four allocations … and there was no significant difference in knee pain reduction between any of the treatment groups and placebo after adjusting for baseline values. Among the subgroup of 221 (37%) participants with severe knee pain … at baseline, there were no significant differences with respect to their maximum knee pain or global assessment and score across different treatment groups.

*Id*. at 3-4; *see also id.* at 5-6 ("there were no significant reductions in knee pain detected for glucosamine or chondroitin alone, or in combination, over the 2-year follow-up period versus placebo"). Fransen and her co-authors also concluded "[t]here were no significant differences" between consumption or glucosamine and/or chondroitin versus a placebo pill for any secondary measures. These measures included  pain, physical function, and health-related quality of life as measured by physical functioning, role limitations due to physical health problems, bodily pain,

16

general health, vitality (energy/fatigue), social functioning, role limitations due to emotional problems, and mental health (psychological distress and psychological well-being).

51.    Using data obtained from NIH-funded initiatives, Yang et al. (2015) analyzed 1,625 participants over a 4-year period to estimate the effectiveness of the combination of glucosamine and chondroitin in relieving knee symptoms and slowing disease progression among patients with knee osteoarthritis. Yang et al., *Effects of glucosamine and chondroitin on treating knee osteoarthritis: an analysis with marginal structural models*, Arthritis & Rheumatology, 63(3):714-23 (Mar 2015). In their report, which was published in the official journal of the American College of Rheumatology, Yang, et al. reported that glucosamine and chondroitin combinations provided no clinically significant benefits in terms of reducing pain or stiffness, improving physical function or mobility, or delaying the progression of joint space narrowing or osteoarthritis.

52.    In 2016, Lugo et al., also published the results from a study comparing a combination of glucosamine and chondroitin versus placebo. Lugo et al., *Efficacy and tolerability of an undenatured type II collagen supplement in modulating knee osteoarthritis symptoms: a multicenter randomized, double-blind, placebo-controlled study*, Nutrition Journa, 15:14 (2016). Lugo was a multicenter, double-blind RCT examining 190 subjects over 180 days. Lugo and co-authors found that a combination of glucosamine hydrochloride (the same glucosamine version in the Osteo Bi-Flex products) and chondroitin sulfate was no better than placebo in terms of joint pain, stiffness, mobility or physical function.

53.    Roman-Blas et al. (2017), was a multi-center, randomized, double-blind, placebo-controlled clinical trial involving 164 participants who received a combination of glucosamine and chondroitin or placebo for six months. Roman-Blas et al., *Combined Treatment With*

00163724

*Chondroitin Sulfate and Glucosamine Sulfate Shows No Superiority Over Placebo for Reduction of Joint Pain and Functional Impairment in Patients With Knee Osteoarthritis*, Arthritis & Rheumatology, 69(1):77-85 (Jan 2017). Roman-Blas and co-authors found that a combination of glucosamine and chondroitin was inferior to a placebo pill in terms of reducing global pain. Glucosamine and chondroitin were also no better than a placebo pill "in any of the secondary outcomes measures," which included improvement in physical function, reduction in joint pain, or improvement in investigator's global assessment of the participant.

54. The results from GAIT and these other clinical studies testing glucosamine and chondroitin combinations versus placebo are also consistent with the reported results of prior and subsequent clinical studies.

55. For example, a 1999 study involving 100 subjects by Houpt et al., found that glucosamine hydrochloride performed no better than placebo at reducing joint pain at the conclusion of the eight-week trial. Houpt et al., *Effect of glucosamine hydrochloride in the treatment of pain of osteoarthritis of the knee*, J Rheumatol, 26(11):2423-30 (Nov 1999).

56. Rindone et al. performed a randomized, double-blind, controlled trial of 98 subjects in 2000. The investigators concluded that glucosamine "was no better than placebo in reducing pain[.]" Rindone et al., *Randomized, controlled trial of glucosamine for treating osteoarthritis of the knee,* The Western Journal of Medicine, 172(2):91-94 (Feb 2000).

57. Likewise, a 2004 study of 205 participants by McAlindon et al. concluded that "glucosamine was no more effective than placebo in treating symptoms of knee osteoarthritis," meaning glucosamine is ineffective. McAlindon et al., *Effectiveness of Glucosamine For Symptoms of Knee Osteoarthritis: Results From and Internet-Based Randomized Double-Blind Controlled Trial*, Am J Med, 117(9):643-49 (Nov 2004). Dr. McAlindon and his co-authors

assessed and found no difference between glucosamine and placebo in terms of pain, stiffness, physical function, or any other assessed outcome. *Id.* at 646 ("[W]e found no difference between the glucosamine and placebo groups in any of the outcome measures, at any of the assessment time points.").

58.    A 2004 study by Cibere et al. studied users of glucosamine who claimed to have experienced at least moderate improvement after starting glucosamine. Cibere et al., *Randomized, Double-Blind, Placebo-Controlled Glucosamine Discontinuation Trial In Knee Osteoarthritis*, Arthritis Care & Research, 51(5):738-45 (Oct 2004). These patients were divided into two groups – one group that was given glucosamine and another group that was given a placebo. For six months, the primary outcome observed was the proportion of disease flares in the glucosamine and placebo groups. A secondary outcome was the time to disease flare. The study results reflected that there were no differences in either the primary or secondary outcomes for glucosamine and placebo. The authors concluded that the study provided no evidence of symptomatic benefit from continued use of glucosamine – in other words, any prior perceived benefits were due to the placebo effect and ***not*** glucosamine. *Id.* at 743 ("In this study, we found that knee OA disease flare occurred as frequently, as quickly, and as severely in patients who were randomized to continue receiving glucosamine compared with those who received placebo. As a result, the efficacy of glucosamine as a symptom-modifying drug in knee OA is not supported by our study.").

59.    Kawasaki et al. (2008) reports the results of a randomized trial among 142 subjects with knee osteoarthritis. Kawasaki et al., *Additive effects of glucosamine or risedronate for the treatment of osteoarthritis of the knee combined with home exercise: a prospective randomized 18-month trial*, Journal of Bone and Mineral Metabolism, 26:279-287 (Feb 2008).

Subjects were given 1500 mg glucosamine hydrochloride per day, and researchers assessed its impact on pain, function, and changes in joint space width. Results showed no effect "regarding any of the scales indicating no significant additive effect of glucosamine[.]" *Id.* at 279. This credible, large study found that glucosamine is ineffective.

60.     A 2008 study by Rozendaal et al. assessed the effectiveness of glucosamine on the symptoms and structural progression of hip osteoarthritis during two years of treatment. Rozendaal et al., *Effect of Glucosamine Sulfate on Hip Osteoarthritis*, Ann Intern Med, 148(4):268-77 (Feb 2008). Rozendaal and co-authors examined 222 subjects and concluded that glucosamine was no better than placebo in reducing pain, improving physical function, or impacting the structural progression of osteoarthritis.

61.     On July 7, 2010, Wilkens et al. reported that there was no difference between placebo and glucosamine for the treatment of low back pain and lumbar osteoarthritis and that neither glucosamine nor placebo were effective in reducing pain related disability. The researchers also concluded that, "Based on our results, it seems unwise to recommend glucosamine to all patients" with low back pain and lumbar osteoarthritis. Wilkens et al., *Effect of Glucosamine on Pain-Related Disability in Patients With Chronic Low Back Pain and Degenerative Lumbar Osteoarthritis*, JAMA, 304(1):45-52 (July 7, 2010).

62.     In 2011, Cahlin et al. published a study evaluating the clinical effects of glucosamine on osteoarthritis in the temporomandibular joints. Cahlin et al., *No effect of glucosamine sulfate on osteoarthritis in the temporomandibular joints – a randomized, controlled, short-term study,* Oral Surg Oral Med Oral Pathol Oral Radiol Endod, 112:760-766 (2011). The trial concluded "[n]o differences in improvement between" glucosamine and a dummy pill. *Id.* at 760.

00163724

63.     A 2017 study by Roman-Blas et al. concluded that the combination of chondroitin sulfate and glucosamine sulfate and the combination of chondroitin sulfate and glucosamine hydrochloride failed to improve structural damage or ameliorate the inflammatory profile of joint tissues. Roman-Blas et al., *The combined therapy with chondroitin sulfate plus glucosamine sulfate or chondroitin sulfate plus glucosamine hydrochloride does not improve joint damage in an experimental model of knee osteoarthritis in rabbits*, European Journal of Pharmacology, 794:8-14 (Jan 2017).

64.     Large, well-conducted clinical trials on persons without diagnosed arthritis have also been conducted, and these studies also demonstrate that glucosamine does not provide any joint health benefits, including reducing joint pain or stiffness, improving mobility, or slowing the progression of arthritis.

65.     Kwoh et al. (2014) is a report from a randomized, placebo-controlled clinical trial measuring the effect of glucosamine hydrochloride on joint degradation, joint pain, and physical function in 201 individuals. Kwoh et al., *Effect of Oral Glucosamine on Joint Structure in Individuals With Chronic Knee Pain*, Arthritis & Rheumatology, 66(4):930-39 (Apr 2014). Kwoh, which studied a mix of subjects with and without osteoarthritis, concluded that glucosamine supplementation provided no joint health, structural, pain or function benefits:

> In this 24-week study, we did not find any evidence that glucosamine is more effective than placebo in improving joint health, when assessed according to the outcomes of decreased cartilage deterioration on MRI, improvement of BMLs on MRI, decreased excretion of urinary CTX-II, and decreased pain or improved function.

*Id*. at 935.

66.     Runhaar et al. (2015) also examined subjects not diagnosed with arthritis and found no benefits from glucosamine. Runhaar was an independently-analyzed double-blind,

00163724

placebo-controlled, factorial design trial testing a diet-and-exercise program and 1500 mg oral glucosamine or placebo on 407 subjects. Runhaar et al., *Prevention of Knee Osteoarthritis in Overweight Females: The First Preventative Randomized Controlled Trial in Osteoarthritis*, Am J Med, 128(8):888-895 (Aug 2015). Researchers examined the impact of daily glucosamine consumption on the incidence of knee osteoarthritis, as well as on pain and physical function. After 2.5 years, no effect from glucosamine was found on subjects' overall quality of life or knee pain, physical function, or the incidence of knee osteoarthritis.

67.    Eraslan and Ulkar (2015) examined the impact of glucosamine versus placebo on knee pain, physical function (including range of motion) and muscular performance over an 8-week period in 30 athletes who did not have osteoarthritis. Eraslan A & Ulkar B, *Glucosamine supplementation after anterior cruciate ligament reconstruction in athletes: a randomized placebo-controlled trial*, Research in Sports Medicine, 23:14-26 (2015). Glucosamine was not effective in terms of any of the joint health parameters: "no significant differences were found regarding pain (VAS), functional status (IKDC, LYS) and muscular strength (isokinetic test) between the glucosamine and placebo groups."

68.    Landsmeer et al. (2016) evaluated 407 (687 knees) middle-aged women without clinical signs of knee osteoarthritis, free of inflammatory rheumatic diseases, and not under the treatment of a physical therapist or general practitioner for knee complaints for a 2.5-year period. Landsmeer et al., *Reducing progression of knee OA features assessed by MRI in overweight and obese women: secondary outcomes of a preventive RCT*, Osteoarthritis and Cartilage, 24(6):982-990 (Jun 2016). The authors concluded that glucosamine "did not show preventive effects on progression of any of the MRI features [of early osteoarthritis] under investigation."

69.    Based on data from 245 people without osteoarthritis, de Vos et al. (2017) determined the impact of glucosamine consumption over an average time period of 6.6 years. de Vos et al., *Long-term effects of a lifestyle intervention and oral glucosamine sulphate in primary care on incident knee OA in overweight women*, Rheumatology, 56(8):1326-1334 (Aug 2017). Study participants consumed placebo or 1500 mg daily glucosamine and periodically reported knee pain, physical activity and quality of life, and had their joint space width was measured by radiograph. Based on six-year analysis, de Vos and co-researchers concluded that glucosamine consumption is not effective at preventing knee osteoarthritis as measured according to either joint space width changes or based on symptomatic changes that included impact on knee pain or joint stiffness.

70.    The other ingredients in Osteo Bi-Flex, boswellic acid, MSM, and Vitamins C and D have also been scientifically studied and demonstrated to not provide joint health benefits.

71.    Hughes et al. (2002) is a 6-month randomized, double-blinded, placebo-controlled trial of a glucosamine preparation that also contained 300 mg vitamin C and 5 mg manganese per day among 80 subjects. Hughes et al., *A randomized, double-blind, placebo-controlled, trial of glucosamine sulphate as an analgesic in osteoarthritis of the knee*, Rheumatology, 41:279-284 (Mar 2002). The study found there was no difference between the placebo and glucosamine plus vitamin C groups in terms of relieving knee pain or stiffness or improving physical function.

72.    Felson et al. (2007) conducted an observational study among 992 subjects from two longitudinal cohort studies (715 from the Framingham Osteoarthritis Study and 277 from the Boston Osteoarthritis of the Knee Study). Felson et al., *Low level of vitamin D and worsening of knee osteoarthritis: Results of two longitudinal studies*, Arthritis and Rheumatology, 56:129-136 (Jan 2007). The purpose of the study was to confirm reports that vitamin D deficiency is

23

associated with an increased risk of joint space narrowing or cartilage loss in OA. No association was found between vitamin D levels and radiographic worsening of joint space indicative of joint pain, stiffness and progression of OA.

73.     Debbi et al. (2011) confirmed the conclusions of the Brien et al. (2011) meta-analysis, which is discussed below. 49 subjects with knee OA consumed either 3,375 mg of MSM (several times more than an Osteo Bi-Flex dose) or placebo for 12 weeks. Debbi et al., *Efficacy of methylsulfonylmethane supplementation on osteoarthritis of the knee: a randomized controlled study*, BMC Complement Altern Med, 27;11:50 (Jun 2011). The primary outcomes were WOMAC scores, Aggregated Locomotor Function (ALF) score, SF-36 health survey score and the VAS pain score. Secondary outcomes were Knee Society Clinical Rating System scores. For the outcomes of WOMAC pain and stiffness, SF-36, ALF and secondary outcomes, MSM was statistically equal to placebo, far from a clinically relevant response. For total WOMAC and VAS pain, the authors concluded that "these, nor the results of previous studies are considered to be clinical improvements according to the criteria set forth by OMERACT and OARSI. This falls in agreement with the meta-analysis for DMSO/MSM performed by Brien et al. that also showed a significant but non-clinically significant improvement in WOMAC or VAS scales for pain in the MSM group."

74.     Magrans-Courtney et al. (2011) conducted a randomized, double-blind, controlled trial in the USA among 30 subjects with knee osteoarthritis. Magrans-Courtney et al., *Effects of diet type and supplementation of glucosamine, chondroitin, and MSM on body composition, functional status, and markers of health in women with knee osteoarthritis initiating a resistance-based exercise and weight loss program*, J Int Soc Sports Nutr, 8(1):8 (Jun 2011). Subjects were randomly assigned to consume either a placebo pill or a supplement containing

1,500 mg glucosamine hydrochloride, 1,200 mg chondroitin sulfate, 900 mg of MSM, and other herbal ingredients. Both groups participated in an exercise program for 14 weeks. The study's primary outcome measures included assessments of strength, pain, stiffness, and physical function. Secondary outcomes included weight loss and body composition, serum blood and hormones, and measures of quality of life. Results showed that participants in both groups experienced significant reductions in body mass, fat mass, and body fat with no significant changes in fat free mass or resting energy expenditure. Perception of knee pain and knee stiffness was decreased while maximal strength, muscular endurance, balance indices, lipid levels, homeostasis model assessment for estimating insulin resistance, leptin, and measures of physical functioning, vitality, and social function were improved in both groups with no differences among groups. The study authors concluded "GCM [glucosamine, chondroitin and MSM] supplementation did not significantly affect remaining markers of isotonic or isokinetic strength, balance, functional capacity, markers of health, self-reported perceptions of pain, or indicators of quality of life."

75.    Notarnicola et al. (2011) was a six-month, randomized, double-blind clinical trial involving 60 subjects consuming a combination of 5 grams MSM and 7.2 mg boswellic acid or placebo. Notarnicola et al., *The "MESACA" Study: methysulfonylmethane and boswellic acids in the treatment of gonarthrosis*, Adv Ther, 28(10):894-906 (2011). The primary endpoint of this study was to assess the efficacy of MSM and boswellic acid in terms of reducing pain and improving joint function. The researchers found that daily consumption of MSM and boswellic acid did not reduce pain or improve joint function. Efficacy was evaluated at two- and six-months follow-up using by assessing changes in joint pain and joint function. At two months, the group consuming the MSM supplement was worse than placebo for pain improvement, and there

was no difference between groups in terms of impacting physical function. At six months, there were no differences in pain or physical function between those persons consuming a placebo or the MSM supplement.

76.     McAlindon et al. (2013) conducted a randomized, double-blind, controlled trial among 146 subjects with knee osteoarthritis. McAlindon et al., *Effect of Vitamin D Supplementation on Progression of Knee Pain and Cartilage Volume Loss in Patients With Symptomatic Osteoarthritis*, JAMA, 309(2):155-162 (Jan 2013). Subjects were assigned to daily consumption of vitamin D or placebo for two years. The study assessed and found no differences at any time between vitamin D and placebo in terms of knee pain severity, cartilage volume loss, physical function, knee function, cartilage thickness, bone marrow lesions, or radiographic joint space width.

77.     Chaganti et al. (2014) conducted a study among 3,026 participants of the Multicenter Osteoarthritis (MOST) Study, which involved persons with and without knee OA. Chaganti et al., *High plasma levels of vitamin C and E are associated with incident radiographic knee osteoarthritis,* Osteoarthritis and Cartilage, 22(2):190-196 (Feb 2014). The study aimed to examine the association of levels of vitamin C and knee OA. Results showed that persons who possessed the highest tertile of vitamin C levels had a higher incidence of knee OA. That is, the presence of vitamin C was associated with knee OA.

78.     Jin et al. (2016) conducted a two-year, randomized, double-blind, controlled trial among 413 subjects with knee osteoarthritis and low levels of vitamin D. Jin et al., *Effect of Vitamin D Supplementation on Tibial Cartilage Volume and Knee Pain Among Patients With Symptomatic Knee Osteoarthritis,* JAMA, 315(10):1005-1013 (Mar 2016). Results showed no significant differences between those consuming vitamin D and placebo in terms of changing

00163724

cartilage volume, pain or biomarkers associated with OA progression, and the authors "findings do not support the use of vitamin D supplementation" for preventing cartilage loss or improving knee pain. *Id*. at 1005.

79.    Cooper et al. (2016) conducted a randomized, double-blind, controlled trial among 474 subjects with knee osteoarthritis. Cooper et al., *Maternal gestational vitamin D supplementation and offspring bone health (MAVIDOS): a multicentre, double-blind, randomised placebo-controlled trial*, Lancet Diabetes and Endocrinology, 4(5):393-402 (May 2016). Subjects were assigned to vitamin D or placebo consumption for three years. The study assessed and found no differences in the rate of joint space narrowing, or changes in pain, physical function, or stiffness.

80.    Tennet et al. (2017) reported the results from an RCT evaluating the use of MSM to improve physical function and quality of life, and to reduce pain in healthy persons. Tennet et al., *A Raondomized Controlled Trial Evaluating Methylsulfonylmethane Versus Placebo to Prevent Knee Pain in Military Initial Entry Trainees,* The United States Army Medical Department Journal, 21-25 (Oct-Dec 2017). 180 subjects were assigned to either a placebo or 3,000 mg MSM daily for eight weeks. The authors found that MSM did not work at any time: "MSM administered daily did not provide significant improvements in the 5 KOOS [Knee Osteoarthritis Outcome Score] subscales or the 9 POMS [Profile of Moods States] subscales at 30 or 60 days."

81.    Many studies have also confirmed there is a significant "placebo" effect with respect to consumption of products represented to be effective in providing joint health benefits such as Defendant's Osteo Bi-Flex products. Indeed, more than 30% of persons who took placebos in these studies believed that they were experiencing joint health benefits when all they

were taking was a placebo. Zhang et al., *The placebo effect and its determinants in osteoarthritis: meta-analysis of randomised controlled trials*, Annals of the Rheumatic Diseases, 67(12):1716-23 (Dec 2008) (Analyzing the placebo effect size from 198 trials relating to joint health benefits and concluding that "[p]lacebo is effective in the treatment of OA, especially for pain, stiffness and self-reported function.").

### Meta-Analyses and Scientific Review Articles

82.     Well-designed and conducted meta-analyses are also considered a high level of evidence because they provide a method to evaluate the aggregated results of all relevant studies according to their pooled effects and methodological quality.

83.     In a 2007 meta-analysis, Vlad et al. reviewed all studies involving glucosamine hydrochloride and concluded that "[g]lucosamine hydrochloride is not effective." Vlad et al., *Glucosamine for Pain in Osteoarthritis*, Arthritis & Rheumatology, 56(7):2267-77 (July 2007); *see also id.* at 2275 ("[W]e believe that there is sufficient information to conclude that glucosamine hydrochloride lacks efficacy for pain in OA.").

84.     In 2009, Towheed et al. published an updated Cochrane Collaboration Review (first published in 2001 and previously updated in 2005). Towheed et al., *Glucosamine therapy for treating osteoarthritis*, Cochrane Database Sys Rev. (2009). Like its earlier versions, the 2009 Cochrane Review and meta-analysis also found that pooled results from studies using non-Rotta preparations of glucosamine (e.g., studies involving the form of glucosamine in Osteo Bi-Flex) or adequate concealment (e.g., patient or investigator blinding) failed to show benefits for joint pain or joint function. The evidence amassed since Towheed's study inclusion cutoff (January 2008) strengthens its conclusion even more. Indeed, in 2017, Pratt and co-authors from the Clinical Epidemiology Program at Ottawa Hospital Research Institute (OHRI), officially

00163724

tasked with analyzing Cochrane reviews, specifically examined whether results from studies published after the Towheed meta-analysis merit updating the Cochrane Review. Pratt et al., *Signal detection report: glucosamine therapy for treating osteoarthritis* (2017). Pratt and co-authors observed that new findings from Fransen (2015), Kwoh (2014), Petersen (2011), and Sawitzke (2010) met the original inclusion criteria, but determined "[p]ooling of [this] new evidence did not change the overall pooled estimates of the original review" by Towheed et al. concerning glucosamine's lack of an effect on joint pain and joint function:

> This is similar to the original review findings of no significant difference between the treatment and placebo for WOMAC pain. One study also reported no statistically significant results for maximum knee pain between the groups. For WOMAC function, three studies reported similar results to the original review findings of no statistically significant difference between glucosamine and placebo.

85.     A 2010 meta-analysis by Wandel et al. examined prior studies involving glucosamine and chondroitin, alone or in combination, and whether they relieved the symptoms or progression of arthritis of the knee or hip. Wandel et al., *Effects of Glucosamine, Chondroitin, Or Placebo In Patients With Osteoarthritis Or Hip Or Knee: Network Meta-Analysis*, BMJ, 341:c4675 (Sep 2010). This independent research team reported that glucosamine and chondroitin, alone or in combination, did not reduce joint pain or have an impact on the narrowing of joint space: "Our findings indicate that glucosamine, chondroitin, and their combination do not result in a relevant reduction of joint pain nor affect joint space narrowing compared with placebo." *Id*. at 8. The authors further concluded "[w]e believe it unlikely that future trials will show a clinically relevant benefit of any of the evaluated preparations." *Id*.

86.     In 2011, Miller and Clegg, after surveying the clinical study history of glucosamine and chondroitin, concluded that, "[t]he cost-effectiveness of these dietary supplements alone or in combination in the treatment of OA has not been demonstrated in North

29

America." Miller K and Clegg D, *Glucosamine and Chondroitin Sulfate*, Rheum Dis Clin N Am, 37:103-118 (2011).

87.    Brien et al. (2011) is a meta-analysis designed to evaluate MSM and Dimethyl Sulfoxide (DSMO), a related supplement (MSM is the oxidized form of DSMO), efficacy in reducing pain associated with osteoarthritis. Brien et al., *Meta-analysis of the related nutritional supplements dimethyl sulfoxide and methylsulfonylmethane in the treatment of osteoarthritis of the knee*, Evid Based Complement Alternat Med, 2011:528403 (Feb 2011). Based on their review and analysis, the authors concluded that, "Current evidence suggests DMSO and MSM are not clinically effective in the reduction of pain in the treatment of OA."

88.    In 2012, a report by Rovati et al. noted that glucosamine hydrochloride "ha[s] never been shown to be effective." Rovati et al., *Crystalline glucosamine sulfate in the management of knee osteoarthritis: efficacy, safety, and pharmacokinetic properties*, Ther Adv Muskoloskel Dis, 4(3):167-180 (Jun 2012).

89.    The meta-analysis by Eriksen et al. (2014) included 25 glucosamine trials, which collectively involved 3,458 patients. Eriksen et al., *Risk of bias and brand explain the observed inconsistency in trials on glucosamine for symptomatic relief of osteoarthritis: A meta-analysis of placebo-controlled trials*, Arthritis Care & Research, 66:1844-1855 (Dec 2014). Eriksen and co-authors found that "[i]n accordance with a previous analysis, we found that glucosamine hydrochloride had no effect on pain" and "glucosamine by and large has no clinically important effect."

90.    Singh et al. (2015) is Cochrane Systematic Review of the efficacy of chondroitin involving results from 43 trials. Singh et al., *Chondroitin for osteoarthritis (Review)*, Cochrane Database of Systematic Reviews, 1:CD005614 (2015). Statistically insignificant results for pain

00163724

scores were seen when the analysis was limited to studies with appropriate allocation concealment, a large study sample, or without pharmaceutical funding. No physical function benefits were found either.

91.    A 2016 scientific review by Vasiliadis et al. concluded that "[t]here is currently no convincing information on the efficacy of [glucosamine] or [chondroitin] as treatment options in [osteoarthritis]," and "when only the information from best quality trials is considered, then none of these supplements seem to demonstrate any superiority [as compared to placebos]." Vasiliadis et al., *Glucosamine and chondroitin for the treatment of osteoarthritis*, World J Orthop, 8(1):1-11 (Jan 2017).

92.    In 2017, Runhaar and co-authors presented results from their meta-analysis of six glucosamine studies (1,663 patients) where the original authors agreed to share their study data for critical re-analysis. Runhaar et al., *Subgroup analyses of the effectiveness of oral glucosamine for knee and hip osteoarthritis: a systematic review and individual patient meta-analysis from the OA trial bank*, Osteoarthritis and Cartilage, 76(11):1862-1869 (Nov 2017). Runhaar 2017 is an "individual patient data meta-analysis" or IPD, which is considered a gold standard of systematic review. The Runhaar IPD meta-analysis concluded that glucosamine has no effect on pain or physical function.

93.    A 2018 review published in The Journal of Family Practice examined the RCT by Roman-Blas et al. (2018) and conclude that the study "found evidence of a lack of efficacy." Lyon et al., *Time to stop glucosamine and chondroitin for knee OA?,* The Journal of Family Practice, Vol 67:9 (Sept 2018). "In patients with more severe OA of the knee, placebo was more effective than CS/GS, and CS/GS had significantly more adverse events. Therefore, it may be time to advise patients to stop taking their CS/GS supplement."

### Evidence-Based Professional Guidelines

94.     Professional guidelines are also consistent in their recommendation against using glucosamine or chondroitin. These "evidence-based" guidelines are based on systematic reviews and/or meta-analyses of all the available study data.

95.     In 2009, the American Academy of Orthopaedic Surgeons ("AAOS") published clinical practice guidelines for the "Treatment of Osteoarthritis of the Knee (Non-Arthroplasty)," and recommended that "glucosamine and/or chondroitin sulfate or hydrochloride not be prescribed for patients with symptomatic OA of the knee." This recommendation was given a grade A, the highest level of recommendation. Richmond et al., *Treatment of osteoarthritis of the knee (nonarthroplasty)*, Journal of the American Academy of Orthopedic Surgeons, 17(9):591-600 (Sep 2009).

96.     In 2011, the Cochrane Collaboration published a decision aid for arthritis patients. *See* The Cochrane Collaboration, *What are my options for managing hip or knee osteoarthritis? A stepped decision aid to discuss options with your practitioner,* (2011).[16] Glucosamine and chondroitin were given a "Level 0" meaning that they "have the same benefits and harms as a placebo (fake treatment)."

97.     In 2013, the AAOS published an update to its 2009 evidence-review and made a "strong" recommendation that neither glucosamine nor chondroitin be used for patients with symptomatic osteoarthritis of the knee. *See* American Academy of Orthopaedic Surgeons, *Treatment of Osteoarthritis of the Knee: Evidence-Based Guideline* (2d ed. 2013). "Twenty-one studies were included as evidence for this recommendation." *Id.* at 6.

---

[16]     available at https://musculoskeletal.cochrane.org/decision-aids

00163724

98.    Based on the AAOS recommendations, in 2014 the American Board of Internal Medicine Foundation issued a publication as part of its "Choosing Wisely" initiative. American Board of Internal Medicine Foundation, *Treating osteoarthritis of the knee Popular supplements don't work,* (2014).[17] The article states that "[m]any studies have shown that glucosamine and chondroitin sulfate do not help to relieve arthritic knees. … people get similar results if they take a placebo–a 'sugar pill' with no active ingredients." It also warns that "[t]hese supplements are a waste of money. You will spend about $130 a year if you take glucosamine/chondroitin supplement every day. To make matters worse, often labels on the bottles are misleading."

99.    Likewise, the American College of Rheumatology ("ACR"), the United Kingdom National Institute for Health and Care Excellence ("NICE"), and the National Health Service England ("NHS England") (part of England's Department of Health) each published clinical guidelines for the treatment of osteoarthritis based on a critical review of published clinical research, including for glucosamine and chondroitin. These professional groups also recommend against using glucosamine or chondroitin for managing the pain, reduced function, and quality of life issues associated with osteoarthritis.

100.    In 2014, the U.S. Department of Veteran Affairs Department of Defense ("VA/DoD") issued a Clinician Guideline Summary based upon the best information available and designed to assist healthcare professionals. The VA/DoD recommended that "[c]linicians should not prescribe chondroitin sulfate, glucosamine, and/or any combination of the two, to treat joint pain or improve function." *Va/DoD clinical practice guideline for the non-surgical management of hip & knee osteoarthritis*, Department of Veterans Affairs Department of Defense, Version 1.0-2014.

---

[17]    available    at    https://www.choosingwisely.org/wp-content/uploads/2018/02/Treating-Osteoarthritis-Of-The-Knee-AAOS.pdf

00163724

101.    In 2014, NICE published clinical guidelines based on the "best available research evidence." NICE National Institute for Health and Care Excellence. *Osteoarthritis: Care and management in adults*. Clinical guideline 177. The guidelines state that "[h]ealthcare professionals are expected to take NICE clinical guidelines fully into account when exercising their clinical judgement[,]" and "[d]o not offer glucosamine or chondroitin products for the management of osteoarthritis." *Id.* at 3, 42.

102.    The National Collaborating Centre for Chronic Conditions ("NCCCC"), a center established by the United Kingdom's National Institute for Health and Care Excellence, produced National Health Service healthcare guidelines stating that "the evidence to support the efficacy of glucosamine hydrochloride as a symptom modifier is poor" and the "evidence for efficacy of chondroitin was less convincing." NCCCC, *Osteoarthritis National Clinical Guideline for Care and Management of Adults*, Royal College of Physicians, London (2008). Consistent with its lack of efficacy findings, the NCCCC Guideline did not recommend the use of glucosamine or chondroitin for treating osteoarthritis. *Id.* at 33.

103.    In November 2017, NHS England submitted a Board Paper to the England Secretary of State. *Items which should not be routinely prescribed in primary care: findings of consultation and next steps – for decision*, NHS England, PB.30.11.2017/05. Glucosamine and chondroitin combination products made "the list of 18 products which they consider to be ineffective, unnecessary, inappropriate or unsafe for prescription[.]" *Id.* at 4. The group also recommended "that the Secretary of State formally consider blacklisting … Glucosamine and Chondroitin[.]" *Id.* at 9. In addition to the recommendations, the working group performed a survey of clinicians, organizations and patients. The survey found that 98% of clinical

commissioning groups agree that glucosamine and chondroitin should not be prescribed to new patients. *Id*. at 60.

104.    In 2018, the American Academy of Family Physicians ("AAFP") published a "Rapid Evidence Review." Ebell, *Osteoarthritis Rapid Evidence Review*, American Family Medicine, 97(8):523-526 (2018). It recommended that the "Best Practices in Orthopedics" was "[d]o not use glucosamine and chondroitin to treat patients with symptomatic osteoarthritis of the knee." The author also concluded that vitamin D supplement is "ineffective for OA."

105.    In 2019, the American College of Rheumatology (ACR) and Arthritis Foundation (AF) organized a panel of nationally recognized academic and practicing physicians to update the 2012 ACR guidelines and recommendations for physicians treating hand, hip, and knee OA patients. The panel of experts "strongly recommended against" health care providers using glucosamine to manage the symptoms of hand, knee or hip osteoarthritis or using chondroitin or "combination products that include glucosamine and chondroitin sulfate" to manage the symptoms of knee and hip osteoarthritis. Kolasinski et al., *2019 American College of Rheumatology / Arthritis Foundation Guideline for the Management of Osteoarthritis of the Hand, Hip, and Knee*, Arthritis & Rheumatology, 72(2):220-233 (Feb 2020). With respect to glucosamine, the 2019 ACR / AF expert consensus guidelines note "[t]he data that were deemed to have the lowest risk of bias fail to show any important benefits over placebo", "[t]he weight of the evidence indicates a lack of efficacy and large placebo effects", and "as with glucosamine there was clear evidence of industry bias" for studies involving chondroitin.

106.    The AAOS, ACR / AF, NICE, AAFP, VA/DoD and NHS England guidelines were based on systematic reviews and/or meta-analyses of all the available study data. For example, the conclusions of the 2019 ACR / AF Guidelines rely on 17 RCTs for glucosamine, 18

RCTs for chondroitin, and 10 RCTs involving a combination of glucosamine plus chondroitin. The NICE authors' conclusion that practitioners should "not offer glucosamine or chondroitin products" was based on a review that included Towheed (2005), which included 25 glucosamine RCTs, Reichenbach (2007), which included 22 chondroitin RCTs, and seven studies that compared glucosamine plus chondroitin versus placebo. The 2013 AAOS "strong" recommendation against glucosamine and chondroitin was based on expert analysis and meta-analyses of 12 glucosamine studies, 8 chondroitin studies, and one study (GAIT) that assessed both.

## The Two Studies Referenced In Defendant's Advertising Are Junk Science

107.    On its packaging for Osteo Bi-Flex, Defendant cites and relies on just two studies – Sengupta et al. (2008), and Sengupta et al. (2010). *See* Exhibit A (back packaging panel).[18] Both studies, which were conducted by the ingredient manufacturer, examined persons with diagnosed osteoarthritis. Both are deeply flawed and do not control the vast amount of well-designed scientific literature in this area as accepted by the scientific community. These serious methodological problems include but are not limited to: failing to statistically control for the large number of endpoints measured, cherry-picking "favorable" results that were not pre-specified, ignoring that the placebo pill also achieved statistically significant results, failing to demonstrate that the Osteo Bi-Flex ingredient being examined (boswellia serrata) was superior to the placebo pill, and focusing on scientifically invalid comparisons versus baseline as opposed to comparisons versus placebo. Despite these flaws, when the data is compared to the placebo

---

[18]    Sengupta et al., *A double blind, randomized, placebo controlled study of the efficacy and safety of 5-Loxin for treatment of osteoarthritis of the knee*, Arthritis Research & Therapy, 10(4):R85 (2008); Sengupta et al., *Comparative efficacy and tolerability of 5-Loxin and Aflapin against osteoarthritis of the knee: a double-blind, randomized, placebo controlled clinical study*, Int J Med Sci, 7(6):366-377 (2010).

00163724

group (a "between-group" comparison) the Osteo Bi-Flex ingredient does not improve pain more than placebo within seven days.

***The Impact of Defendant's Wrongful Conduct***

108.    Despite the scientific evidence demonstrating Osteo Bi-Flex's ineffectiveness, Defendant conveyed and continues to convey that Osteo Bi-Flex is a joint health supplement capable of benefiting joints, including improving the symptoms of osteoarthritis.

109.    As the manufacturer and distributor of Osteo Bi-Flex, Defendant possesses specialized knowledge regarding its content and effects of its ingredients, and Defendant is in a superior position to know whether Osteo Bi-Flex works as advertised.

110.    Specifically, Defendant knew, but failed to disclose, or should have known, that Osteo Bi-Flex cannot benefit joint health and that the well-conducted, clinical studies, meta-analyses and evidence-based guidelines have determined Osteo Bi-Flex's primary ingredients are unable to support or benefit joint health.

111.    Plaintiff and the class members have been and will continue to be deceived or misled by Defendant's false and deceptive joint health representations.

112.    Defendant's joint health representations and omissions were a material factor in influencing Plaintiff's and the class members' decision to purchase Osteo Bi-Flex. In fact, the only purpose for purchasing Osteo Bi-Flex is to obtain the promised joint health benefits.

113.    Defendant's conduct has injured Plaintiff and the class members because Osteo Bi-Flex does not provide the advertised benefits.

114.    Had Plaintiff and other reasonable consumers known this, they would not have purchased Osteo Bi-Flex or would not have paid the prices they paid.

00163724

115.    Osteo Bi-Flex retails for approximately $25-$35 per bottle. Osteo Bi-Flex has been the highest-selling joint health supplement for at least the past five years. Because of Defendant's false and deceptive advertising, consumers paid over $150 million for Osteo Bi-Flex nationwide between June 2014 and June 2015.

## CLASS DEFINITION AND ALLEGATIONS

116.    Plaintiff, pursuant to Fed. R. Civ. Pro. 23(b)(2) and 23(b)(3), assert this action on behalf of the following class:

**Nationwide Class**

All persons who purchased in the United States any of the Osteo Bi-Flex products for personal use between January 19, 2016, and the date notice is disseminated.

**New York Subclass**

All persons who purchased in the state of New York any of the Osteo Bi-Flex products for personal use between January 19, 2016, and the date notice is disseminated.

117.    Excluded from the Class and Subclass is Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Osteo Bi-Flex products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

118.    Certification of Plaintiff's claims for class wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

119.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all Class members is impracticable. Defendant has sold many thousands of units of the Osteo Bi-Flex products to Class members.

00163724

120.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. Specifically, whether Defendant's representations regarding its Osteo Bi-Flex products and their joint health benefits are misleading and deceptive is a question common to the class. Similarly, Osteo Bi-Flex is either capable of providing joint health benefits or it is not, and Defendant's uniform representation that Osteo Bi-Flex is a joint health supplement capable of providing joint health benefits either is true of false. These questions and others like them are common to the class and predominate over individual issues.

121.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above.

122.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiff and her counsel.

123.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually

00163724

litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS ALLEGED

### COUNT I

### Breach of Express Warranty

124.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

125.    Plaintiff brings this claim on behalf of the nationwide Class. In the alternative, Plaintiff brings this claim on behalf of the Subclass.

126.    Defendant, by affirmation of fact and/or promises set forth in its promotions, advertisements, packaging and/or labeling for the Osteo Bi-Flex products created an express warranty that Osteo Bi-Flex would conform to the affirmation and/or promises.

127.    The affirmations of fact and/or promises, which related to the joint health benefits of Osteo Bi-Flex, are express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Class on the one hand and Defendant on the other.

128.    Plaintiff and the Class members performed all conditions precedent under the contract between the Parties.

129.    Defendant breached the terms of the express warranty between the Parties including the express warranties related to the joint benefits of the Osteo Bi-Flex products with Plaintiff and the Class by not providing the Osteo Bi-Flex products in a manner that conformed to the affirmations and/or promises.

130.    Defendant's breach of this express warranty has directly and proximately caused Plaintiff and members of the Class to suffer damages in the amount of the purchase price of the Osteo Bi-Flex products.

131.    Within a reasonable time of discovering the breach of express warranty by Defendant, Plaintiff through counsel notified Defendant of the breach of warranty.

## COUNT II

## UNJUST ENRICHMENT

132.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

133.    Plaintiff brings this claim on behalf of the nationwide Class. In the alternative, Plaintiff brings this claim on behalf of the Subclass.

134.    As a direct and proximate result of its failure to disclose that its Osteo Bi-Flex products were ineffective in providing joint health benefits, Defendant has profited through the sale of the Osteo Bi-Flex products. Although Osteo Bi-Flex products are purchased at retailers, the money from the sales flows directly to Defendant, on which it confers an unjust, substantial benefit.

135.    Defendant's unlawful and wrongful acts, as alleged above, enabled Defendant to unlawfully receive money from Plaintiff and the Class it would not have otherwise obtained.

136.    Plaintiff and the Class members have conferred benefits on Defendant, which Defendant has knowingly accepted and retained.

41

00163724

137.    Defendant's retention of the benefits conferred by Plaintiff and the Class members would be against fundamental principles of justice, equity, and good conscience.

138.    Plaintiff and the Class members seek to disgorge Defendant's unlawfully retained money resulting from their unlawful conduct and seek restitution and rescission for the benefit of Plaintiff and the Class members.

139.    Plaintiff and the Class members are entitled to the imposition of a constructive trust upon Defendant, such that its unjustly retained money is distributed equitably by the Court to and for the benefit of Plaintiff and the Class members.

## COUNT III

### Violation of N.Y. Gen. Bus. Law ("GBL") §§ 349 and 350

140.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

141.    Plaintiff Whyble brings this claim individually and on behalf of the New York Subclass.

142.    Defendant's acts and practices as described herein were consumer-oriented because they undermined the ability of consumers, including Plaintiff Whyble and the Subclass, to evaluate their market options and to make free and intelligent choices.

143.    Plaintiff Whyble and other members of the Subclass are persons within the meaning of New York General Business Law § 349(h). Defendant engaged in business, trade or commerce within the meaning of GBL § 349(a).

144.    Section 349(a) of the GBL declares as unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

145.    Section 350 of the GBL declares as unlawful "[f]alse advertising in the conduct of any business, trade or commerce."

42

00163724

146.    Defendant violated the GBL by representing that its Osteo Bi-Flex products are beneficial for joint health, when, in reality, Osteo Bi-Flex products cannot provide their advertised benefits and Osteo Bi-Flex's ingredients are ineffective at improving, supporting, maintaining or benefiting the health of human joints.

147.    Defendant's violations caused injury to Plaintiff Whyble and the Subclass.

148.    Plaintiff Whyble and the Subclass members purchased Defendant's Osteo Bi-Flex products on the belief that their joints would benefit from Osteo Bi-Flex. Indeed, no consumer would purchase a joint health supplement unless he or she believed it worked.

149.    Defendant's Osteo Bi-Flex products, however, are worthless and cannot provide their advertised benefits. Accordingly, Plaintiff Whyble and the other members of the Subclass have been injured in that they purchased the Osteo Bi-Flex products reasonably believing they could provide the promised benefits.

150.    Plaintiff Whyble and the Subclass members are entitled to recover actual damages, statutory damages, treble damages, reasonable attorneys' fees, and seek an order enjoining Defendant from continuing its false and deceptive conduct.

## JURY DEMAND

151.    Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

00163724

A.      Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B.      Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair and fraudulent business practices;

C.      Ordering actual, statutory and punitive damages;

D.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

E.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

F.      Ordering such other and further relief as may be just and proper.

Respectfully submitted,

Dated: April 24, 2020

BLOOD HURST & O'REARDON, LLP

By:   *s/ Timothy G. Blood*

Timothy G. Blood (*pro hac vice forthcoming*)
Thomas J. O'Reardon II (*pro hac vice forthcoming*)
Aleksandr J Yarmolinets (NY Bar #5157367)
Craig W. Straub (*pro hac vice forthcoming*)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100 / 619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
cstraub@bholaw.com
ayarmolinets@bholaw.com

CARLSON LYNCH LLP
Todd D. Carpenter (*pro hac vice forthcoming*)
1350 Columbia Street, Suite 603
San Diego, CA  92101
Tel: 619/762-1910 / 619/756-6991 (fax)
tcarpenter@carlsonlynch.com

*Attorneys for Plaintiff*

00163724